## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY M. PIERCE, | ) | 3:20-CV-1755 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RODRIGUEZ and THIBEAULT, | ) | |
| *Defendants*. | ) | March 27, 2023 |

### RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

This action concerns allegations that officials from the Connecticut Department of Correction ("DOC") were deliberately indifferent to Plaintiff Jeffrey M. Pierce's health during Defendants' efforts to combat the spread of the novel coronavirus, COVID-19, throughout Osborn Correctional Institution ("Osborn") in the spring of 2020. Plaintiff, who was incarcerated at Osborn at that time, claims that the precautions purportedly implemented at Osborn were not actually followed and that, as a result, he contracted COVID-19 and suffered permanent hearing loss.

Defendants Thibeault and Rodriguez, the Deputy Warden and Warden of Osborn, respectively, seek summary judgment in their favor on Plaintiff's Eighth Amendment claim. Specifically, Defendants argue that there is no genuine dispute of material fact regarding the adequacy of Osborn's precautionary measures and that, even if such measures were inadequate, Defendants are entitled to qualified immunity. For the following reasons, the Court disagrees. Accordingly, Defendants' motion is DENIED.

## I.   FACTUAL BACKGROUND & PROCEDURAL HISTORY

The record contains the following facts, which are undisputed except when noted.  At all relevant times, Plaintiff was incarcerated at Osborn, Thibeault was the Deputy Warden of Osborn, and Rodriguez was the Warden of Osborn.  Pl.'s Local Rule ("L. R.") 56(a)2 Statement ("St."), ECF No. 43-1, ¶ 1.  Prior to the start of the COVID-19 pandemic, Plaintiff was housed in B-Block, and he was employed as a second-shift kitchen worker.  *Id.* ¶¶ 23–24.

On March 13, 2020, Osborn went into an emergency lockdown in an effort to limit the spread of the COVID-19 virus among the staff and inmate population.  *Id.* ¶ 2.  Osborn imposed other precautionary measures to limit the spread of the virus, such as: reducing the prison population density through community release options; suspending visits and group recreation; suspending the use of telephones in cell blocks under quarantine; staff going through COVID-19 screening prior to entering the facility; regular cleaning of inmates' sleeping areas; and providing inmates with instructions on how to keep from contracting COVID-19.  *Id.* ¶¶ 6–7, 10–12.  In early April of 2020, inmates were also provided with cloth masks, and inmates and staff were required to wear masks at all times.  *Id.* ¶¶ 8–9.

Sometime in March or April of 2020, Plaintiff was transferred from B-Block to E-Block.[1]  *Id.* ¶ 24.  Defendants maintain that this transfer was because Plaintiff was a kitchen worker and, at that time, essential inmate workers were moved to E-Block to form a segregated "cohort," which would ensure the continuous operation of essential facility functions.  Defs.' L. R. 56(a)1 St., ECF No. 37-2, ¶¶ 25–26.  Plaintiff takes issue with this explanation, however, because he was only a *second-shift* kitchen worker; first-shift kitchen workers remained housed in B-Block.  Pl.'s L. R.

---

[1] The doors to cells in E-Block contained open bars, while those in B-Block were solid.  Pl.'s L. R. 56(a)2 St. ¶ 29.

56(a)2 St. ¶ 24; Pl.'s Decl., ECF No. 43-2, ¶ 5.  Plaintiff contends that first- and second-shift kitchen workers were housed separately to mitigate the spread of COVID-19 between them.  *Id.*

In mid-April, Plaintiff was terminated from his kitchen job.  Defs.' L. R. 56(a)1 St. ¶ 27; Pl.'s St. of Supplemental ("Suppl.") Facts, ECF No. 43-1 at 6, ¶ 6.  Defendants assert that Plaintiff was terminated from the job because he refused to wear a mask while working and the medical staff did not approve any medical reason why he could not work while wearing the cloth mask he had been supplied.  Defs.' L. R. 56(a)1 St. ¶ 27.  Plaintiff responds that he never refused to wear a mask.  Pl.'s St. of Suppl. Facts ¶ 4.  Rather, he states, he requested an alternative to the cloth mask because he found it difficult to breathe through the cloth mask, which was made of "the same thick, heavy fabric that is used to make the pants worn by inmates at Osborn."  *Id.* ¶¶ 2–4; Pl.'s Decl. ¶¶ 7–8.

Following Plaintiff's termination from his kitchen job, he was moved from E-Block back to B-Block.  Defs.' L. R. 56(a)1 St. ¶ 28; Pl.'s St. of Suppl. Facts ¶ 6.  Defendants contend that, because E-Block had become a segregated "cohort" for essential inmate workers, Defendants moved Plaintiff out of E-Block and back to B-Block because he had been terminated from his kitchen job.  Defs.' L. R. 56(a)1 St. ¶ 28.  Plaintiff claims he was moved from E-Block to B-Block "without explanation."  Pl.'s Decl. ¶ 10.  He also takes issue with Defendants' explanation that he was moved back to B-Block because he was no longer an essential worker, because, as noted above, first-shift kitchen workers had remained housed in B-Block during this time.  Pl.'s L. R. 56(a)2 St. ¶ 24.

Defendants maintain that they were not aware that any inmates in B-Block were infected with COVID-19 at the time Plaintiff was transferred back to B-Block because, throughout April of 2020, Osborn implemented the following precautions regarding the isolation of inmates with

COVID-19.  Defs.' L. R. 56(a)1 St. ¶¶ 33.  If an inmate displayed or complained of COVID-19 symptoms, he was immediately sent to the medical unit, given a swab test, and isolated in the F-Block housing unit pending the results of the test.  *Id.* ¶ 14.  If the inmate had a cellmate, the cellmate was also isolated in F-Block on the opposite side of the tier.  *Id.* ¶ 15.  If the inmate's test results were positive, he would be isolated in the Hospital 2 unit while awaiting transfer to Northern Correctional Institution, which was designated by the DOC as the facility for medical isolation of COVID-19 symptomatic inmates.  *Id.*  These precautionary measures were based on recommendations and instructions provided to Osborn by health service professionals, including the DOC's Chief Medical Officer and the Center for Disease Control ("CDC").  *Id.* ¶ 16; *see also* Thibeault Decl., ECF No. 37-3, ¶ 4.

Citing these measures, Defendants represent that no inmates who had tested positive for COVID-19 were housed in B-Block before mass testing occurred on May 15, 2020.  Defs.' L. R. 56(a)1 St. ¶ 17.  Defendants admit that several inmates in B-Block tested positive for COVID-19 in April of 2020, but maintain that those inmates were immediately transferred out of B-Block, per Osborn's precautionary measures.  *Id.* ¶ 18.  Defendants also assert that the entire B-Block was placed on quarantine when these inmates tested positive.  *Id.*

Plaintiff disputes, however, that Osborn in fact followed those measures with respect to B-Block.  Pl.'s L. R. 56(a)2 St. ¶¶ 14–17.  Plaintiff represents that he "voiced concerns" to prison staff prior to being transferred back to B-Block because he was aware that at least two inmates in B-Block had tested positive for COVID-19.  Pl.'s St. of Suppl. Facts ¶ 7; Pl.'s Decl. ¶ 11.  In addition, after he was transferred back to B-Block, Plaintiff orally informed Defendants that he was aware that other inmates in B-Block had tested positive for COVID-19 and that he did not wish to be housed in B-Block.  Pl.'s St. of Suppl. Facts ¶ 8; Pl.'s Decl. ¶ 13.  Plaintiff represents

that Defendants responded that Plaintiff "was housed appropriately."  Pl.'s St. of Suppl. Facts ¶ 8; Pl.'s Decl. ¶ 13.  Plaintiff attests he later learned that more than ten inmates in B-Block tested positive; he learned this directly from the infected inmates.  *Id.* ¶ 14.  Plaintiff represents that, around this time, approximately April 28, 2020, B-Block was placed on quarantine.  *Id.*; Pl.'s St. of Suppl. Facts ¶ 9.  Also on that date, he submitted a written complaint to Thibeault requesting to be moved to a different unit due to COVID-19, but he received no response.  *Id.* ¶¶ 10–11.

Osborn conducted mass testing on May 15, 2020,[2] Pl.'s L. R. 56(a)2 St. ¶ 20, and Plaintiff represents that he tested positive for COVID-19 the next day, Pl.'s St. of Suppl. Facts ¶ 13. Plaintiff further represents that, as a result of contracting COVID-19, he suffered severe injuries, including permanent hearing loss in his left ear.  *Id.* ¶ 14.

Plaintiff initiated this action *pro se* in November of 2020, and the Court (Bryant, J.) permitted his Eighth Amendment claim to proceed past initial review.  ECF Nos. 1, 8 at 7. Thereafter, the Court (Bryant, J.) granted Plaintiff's motion to appoint *pro bono* counsel.  ECF No. 16.  After the case was transferred to the undersigned, the Court modified the operative scheduling order to permit discovery regarding liability and damages to proceed in phases, in light of the parties' representation that Plaintiff required further medical testing to ascertain the extent of his hearing loss.  ECF No. 32.  Defendants then filed the present motion for summary judgment regarding liability.  ECF No. 37.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and

---

[2] After the mass testing, inmates were housed based on their COVID-19 testing status.  Pl.'s L. R. 56(a)2 St. ¶ 22. Osborn designated B-Block for inmates who tested positive and were asymptomatic, designated C-Block for inmates whose COVID-19 status was unknown, and designated D-Block for inmates who tested negative.  *Id.* ¶ 21.

the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "[O]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## III.   EVIDENTIARY OBJECTION

At oral argument on their motion for summary judgment, Defendants raised, for the first time, an evidentiary objection with respect to certain evidence presented by Plaintiff. Specifically, Defendants objected to the admissibility of two statements presented in Plaintiff's affidavit: first, his statement that, at the time he was transferred from E-Block to B-Block, he "was aware" from "conversations" with "correctional officers and prison staff" that at least two inmates residing in B-Block tested positive for COVID-19; and, second, his statement that he repeatedly "voiced concerns" to Defendants about being housed in B-Block due to the presence of COVID-19. Pl.'s Decl. ¶¶ 11–13. Thereafter, the Court ordered supplemental briefing on the issue, ECF No. 47, and the Court addresses it before considering the merits of Defendants' motion.

As a preliminary matter, Defendants' objection to the admissibility of Plaintiff's statements was inexcusably late. Defendants' opening brief in support of their motion for summary judgment makes no mention of any anticipatory evidentiary objections, and, after Plaintiff's opposition brief put his statements at issue, Defendants did not file a reply brief in support of their motion raising the evidentiary objections. While Defendants were not required to file a reply brief, *see* D. Conn. L. R. 7(d), a reply brief or a motion to strike the offending testimony would have been proper manners in which to raise an evidentiary objection not mentioned in the opening brief. Indeed,

because Defendants failed to raise the evidentiary objection at any point prior to oral argument, the Court would be well within its discretion to disregard Defendants' objection, as it is clearly established that courts in this circuit need not consider an issue improperly raised for the first time at oral argument. *Kosachuk v. Selective Advisors Grp., LLC*, 827 F. App'x 58, 62 (2d Cir. 2020) (summary order) (citing cases to support the proposition that the appellant waived or forfeited an argument raised in oral argument by failing to raise it in his briefs); *Conservation L. Found., Inc. v. Gulf Oil Ltd. P'ship*, No. 3:21-CV-00932 (SVN), 2022 WL 4585549, at *7 n.4 (D. Conn. Sept. 29, 2022) (declining to consider an argument raised for the first time at oral argument). Moreover, by raising the issue for the first time at oral argument, Defendants unfairly blindsided the *pro bono* counsel representing Plaintiff, as well as the Court. Because a party must support its summary judgment arguments with admissible evidence, however, the interest of justice is better served by full consideration of this evidentiary objection, particularly given that the statements subject to the objection are critical to the viability of Plaintiff's case.

Federal Rule of Civil Procedure 56(c)(2) permits a party to object to material cited by the opposing party on that ground that it cannot be presented in a form that would be admissible under the Federal Rules of Evidence. *See also* D. Conn. L. R. 56(a)3; *Spector v. Experian Info. Servs. Inc.*, 321 F. Supp. 2d 348, 352 (D. Conn. 2004) ("The principles concerning admissibility of evidence do not change on a motion for summary judgment."); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 396 (D. Conn. 2008) (quoting cases for the proposition that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

Defendants argue that Plaintiff's statements are inadmissible hearsay. ECF No. 48 at 1, 10; *see Spector*, 321 F. Supp. 2d at 352 (explaining that hearsay evidence should not be considered

on a motion for summary judgment). Federal Rule of Evidence 801(c) defines hearsay as an out-of-court statement offered to prove the truth of the matter asserted in the statement, and such a statement is generally inadmissible. Fed. R. Evid. 802; *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013). When a hearsay statement is contained within another hearsay statement, the distinct levels of hearsay must be independently considered under the hearsay rule and its exceptions. *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 141 (S.D.N.Y. 2015); *see* Fed. R. Evid. 805.

Plaintiff first attests that, at the time he was transferred from E-Block to B-Block, he "was aware" that two inmates residing in B-Block had tested positive for COVID-19. Pl.'s Decl. ¶ 11 He claims to have learned this from "conversations that [Plaintiff] had with correctional officers and prison staff" prior to the transfer. *Id.* Because Plaintiff attests only that he "was aware" that two inmates in B-Block had tested positive for COVID-19, this testimony concerning only his knowledge does not contain an out-of-court statement, and therefore it is not hearsay.

Defendants contend that Plaintiff's testimony as to his knowledge is nevertheless inadmissible because it is based on inadmissible hearsay—the statements of correctional officers and prison staff to Plaintiff. *See* Fed. R. Evid. 805. But the Court is not persuaded by Defendants' argument that the statements by correctional officers and prison staff to Plaintiff constitute inadmissible hearsay. Under Federal Rule of Evidence 801(d)(2)(D), a statement offered against an opposing party that is "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. To lay a sufficient foundation for an agent's admission, the proponent of the admission must establish (1) the existence of an agency relationship; (2) that the statement was made during the course of the relationship; and (3) that it relates to a mater within the scope of that agency. *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d

534, 537 (2d Cir. 1992).  Construing Plaintiff's affidavit in the light most favorable to him and drawing all reasonable inferences in his favor, as is appropriate at the summary judgment stage, *see Kee*, 12 F.4th at 158, the Court finds that Plaintiff has sufficiently laid this foundation for the purpose of the present motion.

To begin, the Court finds that Plaintiff has laid an adequate foundation, for purposes of overcoming summary judgment, that an agency relationship exists between the correctional officers and prison staff from whom Plaintiff gained his knowledge and Defendants, the Warden and Deputy Warden of Osborn.  Defendants argue that Rule 801(d)(2)(D) does not apply because they as individuals, rather than the DOC as an organization, have been sued.  The Second Circuit has noted that, when an individual defendant, rather than an organization, is sued, the relevant question governing the admissibility of the declarant's statement is the presence of an agency relationship between the declarant and the individual defendant; when an agent is "answerable" to the individual defendant, an agency relationship exists for purposes of admitting statements made by the agent against that defendant.  *Zaken v. Boerer*, 964 F.2d 1319, 1322–23 (2d Cir. 1992).  The statements of corrections officers have been deemed admissible under Rule 801(d)(2)(D) in cases involving individual defendant wardens and supervisory prison officials.  *Browne v. Rodriguez*, No. 3:21-CV-329 (VAB), 2023 WL 1069477, at *10 n.4 (D. Conn. Jan. 27, 2023); *see also Kramer v. Dep't of Corr.*, No. 3:15-CV-251 (RNC), 2019 WL 4805152, at *8 n. 17 (D. Conn. Sept. 30, 2019) (admitting statements of correctional officers under Rule 801(d)(2)(A) in suit against DOC and individual defendants).  Here, for purposes of the present summary judgment motion, the correctional officers and prison staff appear to have been "answerable" to Defendants by virtue of

their employment, and therefore a sufficient agency relationship exists to attribute their statements to Defendants.[3]

Further, when the correctional officers and prison staff told Plaintiff about the testing status of other inmates in B-Block, they were acting within the scope of their employment and thus within the scope of the agency relationship.  And their statements relate to a matter within the scope of their employment, specifically, the prison conditions at Osborn at the time.

Additionally, it is far from clear, as Defendants argue, that the capacity in which they are sued bears on the admissibility of evidence against them.[4]  Although Rule 801(d)(2)(D) applies only when the *employee* was acting within the scope of the employment relationship when making the out-of-court statement, nothing about the Rule suggests that the *employer's* capacity—individual or official—is relevant to the admissibility of the employee's statement against the employer.  Rather, the general test of whether the declarant and the defendant had an agency relationship applies.  *See Zaken*, 964 F.2d at 1323.

The Court also disagrees with Defendants' argument that Plaintiff's testimony necessarily implies that the correctional officers and prison staff gained their knowledge through the hearsay statements of some unidentified other party, such as other inmates or officers.  Plaintiff's testimony

---

[3] The decision that this testimony is admissible for purposes of summary judgment is without prejudice to renewal of the objection at trial.  *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438 n.16 (E.D.N.Y. 2013) (allowing the defendant to renew evidentiary objection originally made at summary judgment at trial).  At trial, Plaintiff must establish, through voir dire of the officers and/or Defendants, or other evidence, the existence of an agency relationship sufficient to support admissibility of his statements.  *See* Fed. R. Evid. 104(a).

[4] Relatedly, Defendants argue that, because a supervisory official sued in his or her individual capacity cannot be found vicariously liable under 42 U.S.C. § 1983 and must instead have been personally involved in the allegedly unconstitutional conduct to be found liable, Federal Rule of Evidence 801(d)(2)(A) should not authorize admission of the correctional officers' statements as vicarious admissions against Defendants.  *See Back v. Hastings on Hudson Free Union Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004).  In making this argument, Defendants conflate the concept of personal involvement in the alleged constitutional violation, as matter of liability, with the concept of attributing a prison employee's statement to their supervisor, as an evidentiary matter.  Defendants have not cited any cases holding that, as a general rule, the statements of correctional officers cannot be attributable to the wardens who supervise them when the statements are made in the course of an agency relationship.

contains no context for how the correctional officers and prison staff gained their knowledge,[5] and it is just as possible that they learned the information firsthand as that they learned the information through the hearsay statement of another party.  For their part, Defendants have not provided deposition testimony from Plaintiff or affidavit testimony from their own correctional officers or staff probing the source of the correctional officers' and prison staff's knowledge.  Absent further testimony on that question, the Court will not speculate as to the source of that knowledge.

Accordingly, Plaintiff's affidavit testimony that he "was aware" that at least two inmates residing in B-Block tested positive for COVID-19, which information he learned from conversations with correctional officers and prison staff, is admissible.

Next, Plaintiff attests that he voiced concerns about the presence of COVID-19 in B-Block to prison staff while he was transferred from E-Block to B-Block, and that he subsequently raised the same concerns to Defendants during their unit tours.  Pl.'s Decl. ¶¶ 12–13.  Specifically, Plaintiff attests that he orally informed Defendants that he was aware that other inmates in B-Block had tested positive for COVID-19, told them that he did not want to be housed in B-Block for that reason, and stated that Osborn's COVID-19 precautions required B-Block to have been placed under quarantine.  *Id.* ¶ 13.  The Court concludes that, to the extent this testimony is offered for the truth of the matters asserted therein, the testimony is hearsay because it involves Plaintiff's out-of-court statements to Defendants and other prison staff.  Accordingly, this testimony is not admissible to prove that inmates in B-Block actually had COVID-19 or that Osborn's COVID-19 precautions required B-Block to have been placed under quarantine at that time.

---

[5] That Plaintiff does not identify the correctional officers by name does not necessarily render his statement inadmissible.  In *Zaken*, the Second Circuit explained that, when a declarant is unidentified, there may not be a sufficient foundation to establish the existence of an agency relationship.  964 F.3d at 1324.  Here, by contrast, the facts underlying the agency relationship do not depend on the identification of the specific declarant, as correctional officers, generally, would be considered agents of the facility's wardens.

This testimony is admissible for other purposes, however.  Notably, this testimony is not hearsay if it is admitted for the fact that Plaintiff made the statements to Defendants and for the effect the statements had on Defendants.  *Dupree*, 706 F.3d at 136 ("Thus, a statement offered to show its effect on the listener is not hearsay."); *Nazario v. Thibeault*, No. 3:21-CV-216 (VLB), 2022 WL 2358504, at *2 n.3 (D. Conn. June 30, 2022) (admitting testimony of the plaintiff's statement to the prison warden not for the truth of the statement's content but "to prove that the statement was made to" the warden); Fed. R. Evid. 801, Advisory Committee Notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").  Thus, Plaintiff's testimony that he expressed concern to Defendants and other prison staff regarding the presence of COVID-19 in B-Block is not admissible for the truth of whether there were inmates with COVID-19 in B-Block, but it is admissible to show that Plaintiff voiced those concerns to Defendants and other prison staff.  Defendants' evidentiary objection is therefore sustained in part and overruled in part.

## IV.     EIGHTH AMENDMENT

### A. Legal Standard

Turning to the merits of Defendants' motion, they first contend that they are entitled to judgment as a matter of law because there is no genuine dispute of fact that they did not violate the Eighth Amendment.  Plaintiff's claim that the conditions of his confinement violate the Eighth Amendment arises under 42 U.S.C. § 1983.  "Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) (citing 42 U.S.C. § 1983).

The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment.  U.S. Const. amend. VIII; *Hutto v. Finney*, 437 U.S. 678 (1978).  Although the Eighth Amendment does not "mandate comfortable prisons," it requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care," and to "take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 831 (1994) (internal quotation marks omitted) (quoting first *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), then *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

To demonstrate that prison conditions constitute cruel and unusual punishment, a plaintiff must satisfy an objective element and a subjective element.  *Id.* at 834; *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996).  First, the plaintiff must show that "the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.'"  *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)).  The deprivation must be "objectively, sufficiently serious," such that the plaintiff is "incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834 (citations and internal quotation marks omitted).  Second, the plaintiff must show that the prison official acted with a culpable state of mind, meaning that the official imposed the conditions of confinement with "deliberate indifference to inmate health or safety."  *Id.* (citations and internal quotation marks omitted) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Jolly*, 76 F.3d at 480.

B.  Discussion

1. *Objective Element*

The Court first finds genuine disputes of material fact as to whether the conditions under which Plaintiff was incarcerated in the spring of 2020, related to the presence of COVID-19 in B-

Block, presented a "substantial risk of serious harm."  *See Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019).  There is no "bright line test" for whether a prison condition presents a substantial risk of serious harm under the Eighth Amendment.  *Id.*  Rather, a court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).

Relevant here, "correctional officials have an affirmative obligation to protect inmates from infectious disease" under the Eighth Amendment.  *Jolly*, 76 F.3d at 477.  Courts in this circuit have found that inmates may face a substantial risk of serious harm from the spread of COVID-19 because it is "undisputed—and, indeed, by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death."  *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 440 (D. Conn. 2020) (holding that inmates had demonstrated a substantial risk of serious harm from a COVID-19 outbreak).  *See also Chunn v. Edge*, 465 F. Supp. 3d 168, 201 (E.D.N.Y. 2020) (collecting cases); *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 349 (S.D.N.Y. 2020) (collecting cases and quoting *Jolly*, 76 F.3d at 477, for the proposition that "COVID-19 stands with the roster of infectious diseases from which 'correctional officials have an affirmative obligation to protect inmates'").

The objective seriousness of the risk, however, depends in part on the measures implemented by the prison to counter the spread of COVID-19.  *Chunn*, 465 F. Supp. 3d at 200, 202 (holding that inmates had not demonstrated a substantial risk of serious harm from COVID-19 in light of the prison's precautions); *Gibson v. Rodriguez*, No. 3:20-CV-953 (KAD), 2021 WL 4690701, at *6 (D. Conn. Oct. 7, 2021) (same); *Ransom v. Banks*, No. 1:20-CV-10232 (MKV), 2022 WL 769344, at *7 (S.D.N.Y. Mar. 14, 2022) ("While inadequate measures to protect

detainees against COVID-19 can give rise to a claim for deliberate indifference, that substantial risk of serious harm must be evaluated in light of the totality of the conditions and precautions taken at the prison." (citations and internal quotation marks omitted)).

Here, the Court finds genuine disputes of material fact as to whether COVID-19 presented a substantial risk of serious harm to Plaintiff in April and May of 2020.  Specifically, Plaintiff has presented evidence that Osborn's key precautions regarding the movement of inmates and the isolation of infected inmates were not being followed.  For example, Defendants represent that they attempted to segregate essential inmate workers in E-Block to ensure that the inmate workers, who were moving throughout the prison, would not spread COVID-19 to inmates in other housing blocks.  Defs.' L. R. 56(a)1 St. ¶ 26; *see also* Thibeault Decl. ¶ 16 (explaining that Osborn "co-horted" inmate workers, who were "moving about the facility," to "reduce the likelihood" of spreading COVID-19 to other groups of inmates).  But Plaintiff represents that first-shift kitchen workers were housed in B-Block along with inmates who were not workers, suggesting that COVID-19 was allowed to spread between inmates who were workers and those who were not. Pl.'s St. of Suppl. Facts ¶ 1.

In addition, Defendants maintain that inmates who tested positive for COVID-19 were promptly moved out of B-Block per Osborn's protocols.  Defs.' L. R. 56(a)1 St. ¶¶ 14, 17–18; Thibeault Decl. ¶ 22 (explaining that, although several inmates in B-Block tested positive for COVID in April of 2020, they were "immediately removed from the unit").  But Plaintiff represents that there were in fact inmates who were positive and symptomatic for COVID-19 in B-Block throughout April, well before the entire block was placed on quarantine on April 28, 2020.  Pl.'s Decl. ¶¶ 11 (attesting that Plaintiff was aware of two inmates in B-Block with COVID-19 at the time he was transferred there), 14 (attesting that Plaintiff later learned there were more

than ten inmates in B-Block with COVID-19 before the quarantine).  While Plaintiff's evidence is in the form of his own declaration, and is unsupported by, for instance, statements from other inmates corroborating his account, it is "hard evidence" in the form of his own testimony, and is not "wholly fanciful."  *See Saeli v. Chautauqua Cnty., N.Y.*, 36 F.4th 445, 455–56 (2d Cir. 2022) (internal citations omitted).  The Court must refrain from assessing competing evidence on a motion for summary judgment and must draw all inferences in favor of Plaintiff at this stage.  *Kee*, 12 F.4th at 158.

Accordingly, there is evidence from which a reasonable jury could find that Osborn's COVID-19 precautions pertaining to the segregation of inmate workers and the isolation of infected inmates were not being followed.  This would have significantly increased the risk COVID-19 presented to the inmates there, including Plaintiff.  Although Defendants identify other precautions implemented at Osborn that Plaintiff does not contest, such as the provision of cloth masks to inmates and the suspension of recreational activity among inmates, *see* Pl.'s L. R. 56(a)2 St. ¶¶ 6–10, 12, a reasonable jury could find that those precautions did not obviate the increased risk that accompanied Defendants' failure to adhere to the key precautions designed to identify and isolate infected inmates.  *Fernandez-Rodriguez*, 470 F. Supp. 3d at 351 (finding that the prison's failure to identify and segregate infected inmates caused the precautionary measures to lose effectiveness, which informed the degree of risk faced by inmates).

At least three other courts in this district have considered similar disputes of fact and denied motions for summary judgment on the issue of whether Osborn was following the COVID-19 precautions purportedly in place.  *Nazario*, 2022 WL 2358504, at *6 (finding genuine disputes of material fact as to whether prison officials at Osborn "failed to implement at least some of its alleged COVID-19 policies"); *Hackett v. Rodriguez*, No. 3:21-CV-328 (VLB), 2022 WL

16949369, at *8–9 (D. Conn. Nov. 15, 2022) (finding genuine disputes of material fact as to whether officials at Osborn enforced the prison's COVID-19 policies); *Browne*, 2023 WL 1069477, at *9 (same).

Defendants argue that the present case is more similar to *Gibson*, in which another court in this district granted a motion for summary judgment in favor of Osborn prison officials. *Gibson*, 2021 WL 4690701, at *6. The court in *Gibson* (Dooley, J.) explained that Osborn followed the recommendations issued by the CDC, which was "sufficient to negate any finding that [the plaintiff] was subject to conditions posing a substantial risk of serious harm." *Id.* In so holding, however, Judge Dooley noted that that the plaintiff had presented no evidence that Osborn's procedures were not implemented and followed. *Id.*; *see also Chunn*, 465 F. Supp. 3d at 202 (finding that the inmates had not demonstrated a substantial risk of serious harm from COVID-19 given the prison's precautions). By contrast, here Plaintiff testified that he was aware of two inmates in B-Block with COVID-19 when he was transferred there, in contradiction of Osborn's precautions regarding the isolation of infected inmates, and the Court has found that testimony admissible. *See* Pl.'s Decl. ¶ 11. The other cases from this district in which summary judgment has been denied involved facts suggesting that prison officials at Osborn were not following the COVID-19 precautions purportedly in place, and similar facts have been presented in the instant case, rendering those cases analogous and *Gibson* distinguishable. *Nazario*, 2022 WL 2358504, at *6; *Hackett*, 2022 WL 16949369, at *8–9; *Browne*, 2023 WL 1069477, at *9. Given the genuine

disputes of fact as to whether Defendants indeed followed Osborn's COVID-19 precautions regarding the isolation of infected inmates, summary judgment is improper.

### 2. Subjective Element

The Court also finds summary judgment improper as to whether Defendants were deliberately indifferent to the risk to Plaintiff's health posed by the spread of COVID-19 in B-Block, insofar as there is a question of disputed fact about whether Defendants transferred Plaintiff to B-Block knowing that Osborn's COVID-19 precautions regarding the isolation of infected inmates were not being followed there. *See Farmer*, 511 U.S. at 834. The deliberate indifference standard "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Specifically, the prison official acts with deliberate indifference when he "knows of and disregards" the substantial risk of serious harm, a mental state akin to recklessness. *Farmer*, 511 U.S. at 837, 839–40; *accord Phelps v. Kapnolas*, 308 F.3d 180, 185–86 (2d Cir. 2002). Consequently, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Here, the Court finds genuine disputes of material fact as to whether Defendants were deliberately indifferent to the risk COVID-19 presented to Plaintiff when they transferred him to B-Block in April of 2020. As a preliminary matter, a reasonable jury could find that Defendants were aware that COVID-19 presented a serious enough risk to require precautionary measures. Specifically, a jury could find that, even by March of 2020, the risk of COVID-19 was "obvious." *Martinez-Brooks*, 459 F. Supp. 3d at 441 (finding that prison officials were aware of the risk posed by COVID-19 as early as March of 2020 because, even by that point, "the seriousness of the threat

posed by COVID-19" was "so well known that it would be implausible to suggest that prison officials [were] unaware of this risk"); *Farmer*, 511 U.S. at 842 (explaining that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

In addition, Plaintiff has proffered evidence from which a reasonable jury could find that Defendants knew there were inmates with COVID-19 in B-Block and disregarded the associated risk when they transferred him there. *See Hackett*, 2022 WL 16949369, at *9. To begin, Plaintiff's testimony that correctional officers and prison staff told him that the two inmates in B-Block had COVID-19 suggests that Defendants, the supervisors of those correctional officers and prison staff, were likewise aware that inmates in B-Block were infected with COVID-19. *See* Pl.'s Decl. ¶ 11. While such testimony would not be enough, standing alone, to satisfy the subjective element of Plaintiff's Eighth Amendment claim, Plaintiff's evidence does not end there. Plaintiff further testified that he expressed concern to correctional officers regarding the presence of inmates with COVID-19 in B-Block prior to his transfer, and that he expressed the same concern to Defendants during their unit tours of B-Block. Pl.'s Decl. ¶¶ 12–13. In objecting to the admissibility of this testimony, Defendants argued that the effect of this testimony on the listener had no relevant purpose to Plaintiff's claim. But the subjective element of Plaintiff's Eighth Amendment claim is squarely concerned with Defendants' awareness of the potential risk of serious harm to Plaintiff. The effect of his testimony that he informed Defendants of that potential risk permits a reasonable inference that Defendants were indeed aware of the risk associated with the presence of COVID-19 in B-Block, such that their decision to transfer Plaintiff there and keep him there over his protests constituted deliberate indifference to that risk. In other words, Plaintiff has demonstrated that he brought to Defendants' attention the risk that other inmates in B-Block had COVID-19,

which, if believed by a jury, would permit a reasonable inference that Defendants were deliberately indifferent to the risk of COVID-19 by transferring Plaintiff to B-Block and keeping him housed there even after he complained.

Defendants also contend that a reasonable jury could not find them to have been deliberately indifferent because they implemented precautionary measures to mitigate the spread of COVID-19.  *See Farmer*, 511 U.S. at 844; *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (holding that prison officials were not deliberately indifferent because they implemented precautionary measures and "subjectively believed the measures they were taking were adequate").  As noted above, however, there are genuine disputes of fact as to whether Osborn's COVID-19 precautions relating to the isolation of infected inmates were being followed.  Similarly, there are genuine disputes of fact as to whether Defendants were aware that Osborn's COVID-19 precautions were not being followed, if indeed they were not being followed.  Although Defendants both attested that they "had no reason to believe" the COVID-19 protocols were not being followed, Plaintiff attested that he told Defendants during their regularly scheduled unit tours both that there were inmates with COVID-19 in B-Block and that, per Osborn's precautions, B-Block should have been placed under quarantine.  *Compare* Rodriguez Decl., ECF No. 37-5, ¶ 7, *and* Thibeault Decl. ¶ 24, *with* Pl.'s Decl. ¶ 13.  Construing these disputed facts in the light most favorable to Plaintiff, *Kee*, 12 F.4th at 158, the Court concludes that a reasonable jury could find Defendants were aware of the presence of COVID-19 in B-Block prior to the quarantine on April 28, 2020.  A reasonable jury could further find that, by transferring Defendant

back to B-Block, and keeping him there, Defendants acted both in contravention of the precautions in place at that time and with deliberate indifference to Plaintiff's health and safety.[6]

The three other cases from this district considering similar facts found conflicting affidavits, such as those provided here, sufficient to create genuine disputes of material fact on the question of whether prison officials at Osborn were deliberately indifferent to the risk of COVID-19 in light of evidence presented in those cases that Osborn's precautions were not followed. *Nazario*, 2022 WL 2358504, at *6; *Hackett*, 2022 WL 16949369, at *9; *Browne*, 2023 WL 1069477, at *10. Likewise, here, there are genuine disputes of fact as to whether Defendants acted with deliberate indifference by transferring Plaintiff to B-Block and keeping him there when they were aware of inmates with COVID-19 in B-Block, in contravention of Osborn's COVID-19 precautions. Those disputes of fact are material to the question of whether Defendants violated the Eighth Amendment, and they must be resolved by a jury.

## V.    QUALIFIED IMMUNITY

Defendants next contend that, even if they violated the Eighth Amendment, they are entitled to summary judgment because they are protected by qualified immunity. The doctrine of qualified immunity shields governmental officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

---

[6] Defendants maintain that they cannot be found to have been deliberately indifferent to the risk of COVID-19 because they relied on advice from medical professionals, including the DOC's medical staff and the CDC guidelines, when implementing the precautionary measures. *See Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (holding that there was insufficient evidence of deliberate indifference in light of the evidence that the prison officials relied on guidance from the CDC and medical professionals). This argument, however, misses the point. Plaintiff does not appear to challenge the *adequacy* of the precautionary measures purportedly implemented at Osborn; rather, he challenges Defendants' representation that those measures were in fact followed.

liability while they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The United States Supreme Court has established a two-pronged test governing the qualified immunity defense. "First, a court must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right." *Id.* at 232. If there is no constitutional violation, Defendants are entitled to qualified immunity. *Id.* As explained above, however, there are genuine disputes of material fact as to whether Defendants violated the Eighth Amendment. This precludes a finding that Defendants are entitled to qualified immunity on that basis at this stage.

Under the second prong, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* A prison official's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alterations omitted)). Accordingly, this prong "turns on the objective legal reasonableness of the [defendant's] action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (citations and internal quotation marks omitted). In other words, "even if the plaintiff's federal rights were clearly established at the time of the alleged violation, the defendants may nevertheless enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate those rights." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995). However, a defendant's actions "are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* at 420–21. The question of whether an official's conduct

was objectively reasonable "is a mixed question of law and fact." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004).

Although the COVID-19 pandemic concerned a new virus, the right of prisoners to be protected from infectious disease was clearly established in the Second Circuit long before 2020. *Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981) (holding that a prison's failure to screen new inmates for infectious diseases violated the Eighth Amendment); *Jolly*, 76 F.3d at 477 (holding that "correctional officials have an affirmative obligation to protect inmates from infectious disease," including, in that case, tuberculosis). *See also Hutto v. Finney*, 437 U.S. 678, 682 (1978) (holding that prison officials violated the Eighth Amendment by, among other things, regularly jumbling the inmates' mattresses even though some inmates suffered from infectious diseases). In light of this clearly established law, a reasonable prison official would have known, even in April of 2020, that COVID-19 presented a substantial risk of serious harm from which the official had an obligation to protect inmates.

Moreover, a reasonable jury crediting Plaintiff's testimony that he informed Defendants of the presence of COVID-19 in B-Block could find that Defendants' decisions to transfer Plaintiff to B-Block and keep him there were objectively unreasonable in light of that knowledge. Such a finding would be all the more possible if that jury were to also find that Defendants lacked a credible reason for the transfer. Plaintiff has presented evidence from which a reasonable jury could conclude that Defendants' proffered reasons for transferring Plaintiff out of E-Block— Plaintiff's termination from his second-shift kitchen job and Defendants' attempt to keep inmates workers segregated from the rest of the prison population—do not hold water. Specifically, Defendants represent that they segregated essential inmate workers in E-Block to limit the risk of those inmates, who moved around the facility, exposing non-worker inmates to COVID-19. Def.'s

L. R. 56(a)1 St. ¶¶ 25–26.  Defendants cite this precautionary measure as the reason why Plaintiff was transferred out of E-Block when he was terminated from his kitchen job.  *Id.* ¶ 28.  But Plaintiff maintains that he was a *second-shift* kitchen worker, and that *first-shift* kitchen workers had been housed in B-Block throughout this time period.  Pl.'s L. R. 56(a)2 St. ¶ 24; Pl.'s St. of Suppl. Facts ¶ 1.  Because inmate workers were not effectively segregated in E-Block, Plaintiff contends, Defendants' explanation that they transferred him out of E-Block as a result of his termination from his kitchen job lacks evidentiary support.

If a reasonable jury were to credit Plaintiff's representation that inmate workers were not actually segregated in one housing block, the same jury could find Defendants' decision to transfer Plaintiff unsupported by any credible reason.  Coupled with Defendants' awareness of the inmates with COVID-19 in B-Block, a reasonable jury considering this record could find Defendants' conduct in transferring Plaintiff to B-Block objectively unreasonable.

Finally, while Defendants maintain that they implemented precautions to protect inmates from the risk of COVID-19, there are genuine disputes of material fact as to whether Defendants followed those precautions or were aware that the precautions were not being followed, as noted above.  A reasonable jury considering those disputed facts could find that Defendants' decision to transfer Plaintiff to B-Block and keep him there, where the risk of COVID-19 was objectively significant and where they knew Osborn's COVID-19 precautions regarding the isolation of infected inmates were not being followed, was objectively unreasonable in light of the clearly established law at the time, thus precluding qualified immunity.  *Nazario*, 2022 WL 2358504, at *8; *Hackett*, 2022 WL 16949369, at *11; *Browne*, 2023 WL 1069477, at *12.  Accordingly, summary judgment on qualified immunity grounds is not proper at this stage.

## VI.    CONCLUSION

For the reasons described above, Defendants' motion for summary judgment as to liability, ECF No. 37, is DENIED.  The Court will convene a status conference to discuss a schedule for remaining activity in the case.

**SO ORDERED** at Hartford, Connecticut, this 27th day of March, 2023.

_/s/ Sarala V. Nagala_
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE